NOTICE

Decision filed 06/18/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240848-U

NO. 5-24-0848

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| LAKE SUZANNE MHP, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 24-EV-459 |
| | ) | |
| AMANDA GAVINS, | ) | Honorable |
| | ) | Patrick R. Foley, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1     *Held*:    Trial court's finding of a forcible entry and detainer judgment was not against the manifest weight of the evidence, where appellant's reasons for not paying rent were not among those permissible by statute.

¶ 2                                 I. BACKGROUND

¶ 3     On March 15, 2024, Lake Suzanne MHP, LLC (Lake Suzanne) filed an eviction complaint against Amanda Gavins and Warrior Properties, LLC. It alleged that it had the right to possession of Lot 91 in its mobile home park because Amanda had stopped paying rent. It requested payment of past-due rent in the amount of $5,375.81, plus attorney fees. A copy of the lease was attached, which indicated that Amanda had entered into a lease on May 14, 2020, for Lot 91 at Lake Suzanne for $400 per month. The lease commenced on June 1, 2020, and terminated on May 31, 2022, with an automatic renewal provision if neither party terminated the lease.

1

¶ 4     Amanda was served with a copy of the complaint on April 21, 2024. She filed an answer on May 6, 2024, denying the allegations of the complaint. The matter was scheduled for trial on June 13, 2024.

¶ 5     On that date, Diane Sikes, the community manager at Lake Suzanne, testified that Amanda signed a lease wherein she agreed to pay $400 per month plus utilities for a lot on which she placed her own mobile home. The last time Amanda made a payment was on August 3, 2023. In addition to late fees and administrative charges, the total amount Amanda owed was $7,235.81. Lake Suzanne also sought immediate possession, attorney fees, and costs.

¶ 6     Sikes testified that Amanda's mother lived in the trailer but had no lease with them. She did not know how long Amanda's mother had been living in the trailer, but she was not maintaining the lot and had not mowed the grass, which was approximately three feet high.

¶ 7     Amanda testified that she purchased the mobile home in 2020 and stopped living there in September 2023, when she moved to California. She returned periodically for various reasons and stayed at the property. No one lived there, but Amanda's family visited to keep the interior in good condition and to check her mail. They did not perform maintenance to the exterior.

¶ 8     Amanda admitted that she stopped paying rent in August 2023. She did not know how much she owed because she disputed the utility fees, administrative fees, trash fees, and the increase in lot rent. The lease allowed her to be assessed for utilities, and for the first two years, she was only charged for water and sewer. When the lot rent increased in December 2022, a fee for waste removal and an administrative fee were also imposed, the terms of which were not added to her lease, nor did she receive notification thereof. She believed that she did not owe any money.

¶ 9     Since purchasing the mobile home in 2020, she had never had any late payments until September 2023. Amanda wanted to sell the mobile home and took a potential buyer to the

manager's office so the buyer could complete an application to purchase it. The manager, Amanda Wellbaum, told Amanda that she could not sell the mobile home to the buyer, but she needed to sell it to management, who would then sell it to the buyer. Ms. Wellbaum also told Amanda that she could not sell the mobile home because she had an outstanding balance on her account. After some conversation, Ms. Wellbaum "stood corrected in regards to the past due balance," and Amanda was told that her account would be corrected. At some point, her ledger was corrected, but no one followed up with her regarding the sale of her mobile home, and she was unable to get in touch with Ms. Wellbaum. At one point, Amanda went into the management office looking for Ms. Wellbaum, and law enforcement was called. As a result, Amanda was cited for trespassing. Amanda eventually received an email from upper management and conversed with Sikes.

¶ 10　　Despite disputing the utility charges on her account, Amanda paid them in full to bring her ledger balance to zero so she could sell the mobile home. Approximately 75 families contacted her and expressed interest in the mobile home, and she showed it to about 15. However, the management office did not screen the applicants until Amanda sent them the Illinois Mobile Landlord and Tenants Rights Act. Upon sending it, Amanda immediately received an email from Ms. Wellbaum inquiring about the purchasers interested in the home. There was no explanation from Ms. Wellbaum as to why it took four weeks for the process to start. Before management started to screen the applicants, Amanda had informed them that she would withhold rent and had voided the September rent payment. Amanda then spoke to Sikes, who told her that the previous manager had not sabotaged her sale and that she could now sell it privately. Sikes did not mention the passing of the several weeks, the behavior of the previous manager, or being cited for trespassing.

3

¶ 11 Amanda had several family members stop by the mobile home to ensure everything was being taken care of. She lost money on flights and had job interviews that had to be rescheduled. She hired movers to transport items from her mobile home into storage, making the mobile home clean and empty for the new buyers. However, after the sale did not occur, she was left with storage fees, utility bills, and had to pay family members to check on the home. She testified that she lives at the home part-time when she is in Illinois.

¶ 12 Amanda stated that she does not owe any rent because if Lake Suzanne had not interfered with the mobile home sale in August 2023, she would no longer have had to pay rent for the lot. She stated that if she was ordered to pay back rent, it should be $400 per month minus the administrative and trash fees. In addition to the administrative and trash fees, Amanda was disputing the rent increase.

¶ 13 On rebuttal, Sikes testified that if a buyer wanted to purchase a mobile home, they would have to apply online, and in this instance, she did not believe anyone did so. To apply online, the applicant must first be forwarded a link.

¶ 14 Brian Flynn, Lake Suzanne's attorney, testified regarding attorney fees. He had been practicing for 14 years and had an hourly rate of $310. In this matter, including the trial, he spent 4.75 hours, for a total of $1,472.50, and believed that was fair and reasonable for like services in the community. His costs, including filing fees and service fees of $616.58, totaled $2,089.08.

¶ 15 Amanda objected to the attorney fees, filing fees, and costs. As a result, Mr. Flynn was ordered to submit an attorney's affidavit, and upon receipt, Amanda was to file an objection explaining her basis. The trial court took the matter under advisement and indicated it would rule within 21 days.

¶ 16     On June 14, 2024, Mr. Flynn filed an affidavit of attorney fees, listing his work performed on the matter, the breakdown of the fees and costs, and the total fees and expenses for his request of $2,089.08. On June 21, 2024, Amanda filed an objection, stating that the eviction was filed to harass her. She indicated that Mr. Flynn, as a "seasoned attorney," should not have had to spend the amount of time he did on her case. She contested the filing fee and service fee as excessive.

¶ 17     On July 16, 2024, the parties appeared for a hearing on attorney fees. Mr. Flynn testified that he represented Lake Suzanne for evictions, but had no formal contract with them. His hourly rate was $310, for which he had submitted an affidavit of attorney fees and costs. He agreed with Amanda's objection regarding his costs for preparation against the codefendant, Warrior Properties, LLC, and stated that Amanda should not be held responsible for those fees. He also said he would dismiss Warrior Properties, LLC, since he never obtained service. The matter was taken under advisement.

¶ 18     On July 17, 2024, the trial court entered an eviction order, granting the complaint and ordering Amanda to vacate the premises by July 31, 2024. It also granted rent, fees, and costs totaling $8,146.37, which included $6,360.58 for rent, $313.29 for court costs, and $1,472.50 for attorney fees. On July 19, 2024, Amanda filed a *pro se* notice of appeal.

¶ 19     On appeal, Amanda argues that the eviction was filed in retaliation "after landlord prohibited the owner from excursing legal right to privately sell a home." She contends that she is not responsible for rent due after August 2023 because had Lake Suzanne "not frustrated" the sale of her home, she could have vacated the premises by August 2023. She states that it was Lake Suzanne's conduct that caused her to remain on the premises.

¶ 20     She asserts that the trial court erred in "ordering payment of unlawful charges of excess of lot rent $195 for dates 9/2022-current." She maintains that the lease contains a clause for automatic

5

renewal upon expiration, for a term equal to the original lease. The original lease was for two years, "which means [o]n June 1, 2022 lease renewed at same amount $400/month for additional 2 years set to expire May 31 2024." She cites section 9 of the Mobile Home Landlord and Tenant Rights Act (765 ILCS 745/9 (West 2022)) for her argument that she should have been entitled to 30 days' written notice before the rent increase.

¶ 21    Third, she argues that the trial court erred by "neglecting to compel the plaintiff to explain illegal behavior" and that its actions undermined "the integrity of the trial." She is seeking damages and losses she incurred in the amount of $32,450 plus punitive damages of $25,000. She requests that we reverse the trial court's judgment, dismiss the matter with prejudice, and award her actual and punitive damages.

¶ 22    In response, Lake Suzanne argues that while the trial court did not provide an analysis of its decision, Amanda's arguments were taken into consideration as their relief was not granted in full. The trial court awarded less than they requested for rent and court costs. It further asserts that "[i]t defies common sense that Appellant seeks to owe zero dollars yet admits still living at the property on a part time basis and storing property there." It requests that we affirm the trial court's order.

¶ 23    In her reply brief, Amanda argues that Lake Suzanne violated the Mobile Home Landlord and Tenant Rights Act (765 ILCS 745/1 *et seq.* (West 2022)) and that their actions "meet all the necessary elements of material breach of contract, and interference in the sale of her home." She maintains that Lake Suzanne unlawfully increased the rent during the lease term and charged unexplained miscellaneous fees that were required to be disclosed under the lease. She asserts it was unfair for Lake Suzanne to "sabotage her sales" in violation of the Act and then use the resulting harm against her. She requests that we reverse the trial court's findings and award her

6

compensatory damages for a lost sale and punitive damages totaling $50,000. She also requests that we vacate the trial court's decision and remand for a new hearing.

¶ 24                                    II. ANALYSIS

¶ 25     This matter was brought under the Eviction Act (735 ILCS 5/9-101 *et seq.* (West 2022)), as Amanda leased the lot upon which her mobile home was placed. "The plaintiff in an eviction action bears the burden of proof in establishing its right to possession and must prove its allegations by a preponderance of the evidence." *Board of Directors of Winnit Park Condominium Ass'n v. Bourdage*, 2021 IL App (1st) 192536, ¶ 33; 735 ILCS 5/9-109.5 (West 2022). Here, the trial court had the opportunity to weigh the evidence and make findings of fact, and we will defer to the trial court's findings unless they are against the manifest weight of the evidence. *Bourdage*, 2021 IL App (1st) 192536, ¶ 33. " 'A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence.' " *Bourdage*, 2021 IL App (1st) 192536, ¶ 33 (quoting *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002)).

¶ 26     The lease at issue concerned a mobile home owned by Amanda placed on a lot she was leasing from Lake Suzanne. She entered the lease on May 14, 2020, and agreed to pay $400 per month commencing June 1, 2020, and terminating on May 31, 2022. The lease allowed for automatic renewal of the same original terms unless at least 30 days' notice was provided by one party to the other for termination thereof. Here, neither party sought to terminate the lease at the expiration of the original term, and it automatically extended with a termination date of May 31, 2024.

¶ 27     Amanda admittedly stopped paying rent in September 2023. She argues that she should not be responsible for rent because Lake Suzanne thwarted the sale of her mobile home, thus causing

7

her to have to remain on the lot. Generally, a defense to a forcible entry and detainer action falls into one of four categories: "(1) claims asserting a paramount right of possession; (2) claims denying the breach of any agreement vesting possession in plaintiff; (3) claims challenging the validity or enforceability of the document upon which plaintiff's right to possession is based; and (4) claims questioning a plaintiff's motivation for the bringing of the forcible action." *Subway Restaurants, Inc. v. Riggs*, 297 Ill. App. 3d 284, 287 (1998). While Amanda's defense does not fall under any of these categories, we will examine her claim nevertheless.

¶ 28     The sale of a mobile home on a leased lot is governed by the Mobile Home Landlord and Tenant Rights Act (Act) (765 ILCS 745/1 *et seq.* (West 2022)). More specifically, section 24 of the Act states a mobile home park owner "shall be enjoined and restrained from prohibiting, limiting, restricting, obstructing, or in any manner interfering with the freedom of any mobile home owner to" sell the mobile home to a purchaser of the mobile home owner's choice. 765 ILCS 745/24(a) (West 2022). However, section 24 further states the "park owner shall be allowed to promulgate any general qualifications or lawful restrictions on park residents which limit or define the admission of entrants to the park." 765 ILCS 745/24(a) (West 2022). We point out that Amanda did not file a claim against Lake Suzanne for violation of this section. Instead, she merely utilized it as a defense during the eviction trial for her failure to pay rent, and similarly raises it on appeal.

¶ 29     In addition to the Act regulating the sale of mobile homes, the lease also provides several guidelines. More specifically, paragraph 23 states that Lake Suzanne is entitled to screen prospective tenants for financial and background information. Paragraph 26(a) provides that a completed application must be on file for every home and homeowner. Finally, paragraph 26(n) indicates that all residents of Lake Suzanne must be screened through Lake Suzanne's "normal screening process" and that no person is allowed to move in before the screening process is

8

completed.

¶ 30　Amanda provided copies of emails between her and Lake Suzanne as exhibits during the trial, arguing that they support her contention that she was justified in not paying rent from September 2023 onward. However, a review of the email exhibits refutes this argument. On August 30, 2023, Amanda emailed Lake Suzanne regarding some issues she was having with them. In that email, she discussed the sale of her mobile home and stated that the lease does not allow Lake Suzanne to have input regarding who she can sell it to. She further referenced buyers she had and said that "the title is already in process to be transferred" to them. She requested that Lake Suzanne process the new buyers' applications immediately. She stated she had been waiting a week for Lake Suzanne to communicate with her concerning the buyers' application.

¶ 31　On September 8, 2023, Lake Suzanne emailed Amanda, asking for information regarding the buyers, and indicated that the buyers had not completed an application. In response, Amanda stated in part:

"After your completely unacceptable attitude and behavior, and lies spewed to hold up the sale of my mobile home— I refuse to work with you or Conisha regarding any matter of this account."

¶ 32　On September 11, 2023, Lake Suzanne responded, stating in part:

"We will need the contact information for the prospects that you want to sell your mobile home to as I requested on 9/8/2023, I also explained in that email that you may sell your mobile home privately we would just need to run the prospect that you are attempting to sell your home to due to that your mobile resides on our lot at Lake Suzanne Mobile Home Park."

In response, Amanda sent an email on that same date at 8:38 a.m., accusing Lake Suzanne of

9

"maliciously and purposefully" interfering with her rights to sell her mobile home. She stated that she had brought the buyers into the management office on August 25, 2023, and claims she was told that she could not sell the mobile home to them. She further stated:

> "Now you wanna skip over all that and pretend your a*** has been willing to help. No I'm sueing you, so that you can never do property management in the state of Illinois again and have already met and talked with other owners this isn't the first time your company tried to retaliate against us and I know This is a great class action waiting to happen. As I told You 10 minutes ago. I am now refusing to pay any lot and your company will either have to buy my mobile home at the price I was selling it at and every additional expense I've incurred due to this inconvenience you caused. Or start the eviction process. Because Im not paying you m*** f*** an additional cent more."

¶ 33    Presumably, Sikes called Amanda after this email, because Amanda sent another email at 2:37 p.m. stating in part:

> "Diana you have been clearly copied on this thread for a few emails now and couldve [*sic*] easily went back and read what's been going on before calling me and acting dumb. To call me and act like you don't know or understand the severity of how Amanda's behavior held up and interfered with the sale of my homes makes me feel like you are just as incompetent as her. But I know better you guys are now just trying to cover your a*** and it's too late. It was Amanda's assistant in the office who said she was instructed by YOU to purposely misinform owners about the selling/buying process."

She reiterated that she would not pay rent and hopes Lake Suzanne will take her to court.

¶ 34    No email was submitted as an exhibit by Amanda indicating that she ever provided the prospective buyers' information after being requested to do so on September 8, 2023. Instead, she

10

sent hostile, accusatory, and argumentative emails that provided no substance regarding any potential buyer. Pursuant to section 24 of the Act, as well as the terms of the lease agreement, Lake Suzanne had every right to request information about the prospective buyers and perform a background check. Amanda's failure to provide that information when requested is no fault of Lake Suzanne's. While Amanda may have gone to the management office on August 25, 2023, with the prospective buyers, and there may have been some confusion on the part of Lake Suzanne as to what the process for the sale entails, Lake Suzanne, the following week, reached out to Amanda both via email and by phone requesting the information they would need to conduct their checks. Amanda did not respond with the requested information, but instead with accusations and aggression.

¶ 35    Amanda frustrated her sale by not being cooperative and not simply providing the requested information when asked. Amanda's defense that she should now be absolved of paying rent from September 2023 onward because the background checks were not done is baseless. Amanda is the one who refused to cooperate, not Lake Suzanne. Amanda is the one who caused the delay in the sale of her mobile home, not Lake Suzanne. Furthermore, even if Lake Suzanne had obtained the buyers' names by August 25, 2023, there is no indication that the background check results would have been received by September 1, 2023, when rent was due, or that the buyers would have passed the screening. Amanda admitted during the hearing that she did not pay rent commencing September 2023, and her defense to not paying rent is not viable. Consequently, the trial court's granting of the eviction complaint was not against the manifest weight of the evidence.

¶ 36    Amanda next argues that she should not have to pay for the increase in lot rent of $195 per month. "Where a trial court makes an award of damages following a bench trial, the standard of

11

review is whether the trial court's judgment is against the manifest weight of the evidence." *2460-68 Clark, LLC v. Chopo Chicken, LLC*, 2022 IL App (1st) 210119, ¶ 28. We initially note that Amanda's argument in her brief concerning the increase in lot rent is limited to one sentence and contains no reference to case law, statute, or the record on appeal. Furthermore, she fails to provide any insight into what she believes the proper calculation for unpaid rent should be. Consequently, we find that she has failed to adequately brief this issue, resulting in forfeiture. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited ***."); see *Masouridis v. Ocasek*, 2019 IL App (1st) 181407-U, ¶ 13.

¶ 37    With that said, we briefly point out that section 6 of the Act specifically states:

"The park owner shall give 90 days' notice of any rent increase and no rent increase shall go into effect until 90 days after the notice. Upon receipt of the notice of the rent increase, a tenant shall have 30 days in which to accept or reject the rent increase. If the tenant rejects the rent increase, the tenant must notify the park owner of the date on which the tenant will vacate the premises, which shall be a date before the effective date of the rent increase." 765 ILCS 745/6(d) (West 2022).

According to the ledger, the rent increased on December 1, 2022, from $400 to $595 monthly. Amanda provided no documentation that she rejected the rent increase, nor did she vacate the premises before December 1, 2022, as required by the Act. She continued to pay the increase in lot rent until she ceased paying rent altogether in September 2023. Amanda did not comply with the Act concerning the increase in lot rent, and she cannot argue 10 months later that she should be absolved of paying it. While there is nothing in the record that reveals the trial court's detailed reasoning in its computation of damages, "[t]he circuit court is presumed to know the law and apply it properly." *In re N.B.*, 191 Ill. 2d 338, 345 (2000). Therefore, "[w]e must *** conclude

12

that the evidence that was heard fully supported the" trial court's monetary judgment, and its findings were not against the manifest weight of the evidence. *King v. Find-A-Way Shipping, LLC*, 2020 IL App (1st) 191307, ¶ 31.

¶ 38 Amanda similarly argues that she should not be held responsible for the trash and administrative fees, as they were not a part of the original lease. Again, her briefed argument about these fees consisted of one sentence, with no explanation or calculation as to what she believes the proper assessed fees should be. As previously noted, we find such an argument forfeited due to the lack of an adequately briefed issue. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited ***."). We note, however, that paragraph 4 of the lease states that the tenant agrees to "pay for all gas, water, electric, power, telephone and other services." Trash and administrative fees are encompassed under "other services." While she may not have been charged for them initially, it may have been an oversight on Lake Suzanne's part. In any event, these fees started appearing on Amanda's ledger in January 2023, and she paid them with no objection until September 2023, when she stopped paying altogether. Consequently, we find that Amanda should be responsible for them.

¶ 39 Amanda's final assertion is that because of Lake Suzanne's actions, she wasted time, had to reschedule and cancel flights, missed school, and missed work, totaling $32,450 in damages. She also requests punitive damages of $25,000 "to deter plaintiff from future fraudulent and deceitful conduct and practices." However, nothing in the record indicates that these requests for damages were raised by either written or oral motion to the trial court. " 'Issues raised for the first time on appeal are waived.' " *Gillard v. Northwestern Memorial Hospital*, 2019 IL App (1st) 182348, ¶ 49 (quoting *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 161 (1999)). Since the request for damages was not first addressed in the trial court and is being

13

raised for the first time here on appeal, said argument is waived and, therefore, will not be addressed.

¶ 40                                    III. CONCLUSION

¶ 41    For the foregoing reasons, we affirm the trial court's judgment.

¶ 42    Affirmed.